**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MEDSERV INTERNATIONAL, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-05-3173 |
| MICHAEL ROONEY | * | |
| Defendant. | * | |

*****

**MEMORANDUM OPINION**

On March 13, 2006, this matter came before the Court for a hearing on Plaintiff's Motion for Preliminary Injunction. MedServ International, Inc. ("Plaintiff" or "MedServ"), a refurbisher of medical equipment, seeks to enforce a non-compete agreement against Michael Rooney ("Defendant" or "Rooney"), one of its former sales representatives. Having heard from all the parties, considered the arguments made in open court, and reviewed the pleadings with respect to the instant motion, it is the opinion of the Court that Plaintiff's Motion for Preliminary Injunction should be granted in part and denied in part. Specifically, the Court shall give effect to the provisions of the restrictive covenant that prohibit Rooney from soliciting customers of MedServ; the covenant's prohibition on general "competition," however, is broader than necessary to protect MedServ's business and will, consequently, be stricken from the agreement.

**I.      FACTUAL & PROCEDURAL BACKGROUND**

The facts of this case were previously set forth by the Court in an Opinion and Order dated February 7, 2006. Nevertheless, the Court will briefly state the facts relevant to the pending motion. Medserv is a Maryland corporation "engaged in the business of servicing, repairing, and

1

refurbishing medical equipment and devices for medical providers nationwide." (Compl. ¶ 5.) In 1998, Rooney, a resident of Massachusetts, became a MedServ Business Associate, responsible for identifying potential MedServ customers and maintaining MedServ's ties with its existing clientele. MedServ and Rooney executed a Business Associates Agreement (the "Agreement"), which provided that Rooney was to be MedServ's exclusive sales associate in the New England area (specifically, eastern Massachusetts, Rhode Island, and southern Connecticut) and that he would receive a commission of 23% on the gross invoice price of all orders received and delivered into his sales territory. The Agreement also contained restrictive covenants that prohibit Rooney, for one year following his termination, from competing with MedServ, disclosing MedServ's trade secrets, or contacting MedServ's customers.

On November 1, 2005, Rooney terminated his employment relationship with MedServ. MedServ alleges that prior and subsequent to his termination, Rooney violated the non-compete covenant by soliciting customers on behalf of of FiberTech Medical U.S.A. ("Fibertech"), a direct competitor of MedServ. On November 17, 2005, MedServ filed a complaint in the Circuit Court for Montgomery County, Maryland, seeking damages and emergency injunctive relief. The following day, the Circuit Court granted MedServ's motion for a temporary restraining order, enjoining Rooney from continuing any association with Fibertech and from contacting any MedServ employees or customers. On November 23, 2005, the case was removed to this Court on the basis of diversity jurisdiction. On November 28, Rooney filed a motion to transfer this action to the United States District Court for the District of Massachusetts. On December 1, MedServ filed a motion to extend the state-court temporary restraining order and for a hearing on its request for a preliminary injunction. On December 27, Rooney filed an answer to the complaint in which he

asserted counterclaims against MedServ and third-party claims against L. Fond Koo and Deborah Barker, both of whom are officers of MedServ. On February 7, 2006, MedServ, Koo, and Barker moved to dismiss the third-party claims and all but one of the counterclaims. That same day, this Court issued a Memorandum Opinion denying Rooney's motion to transfer and directing the parties to contact chambers to schedule a hearing on MedServ's request for injunctive relief.

**II.   ANALYSIS**

A district court deciding whether to grant a preliminary injunction must consider the following four factors:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;
> (2) the likelihood of harm to the defendant if the requested relief is granted;
> (3) the likelihood that the plaintiff will succeed on the merits; and
> (4) the public interest.

*Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  The plaintiff bears the burden of establishing that these factors favor granting the injunction.  *Manning*, 119 F.3d at 263.

Under this hardship balancing test, the first two factors regarding the likelihood of irreparable harm to the plaintiff if relief is denied and of harm to the defendant if it is granted are the most important.  *Id.*  As such, "the first task of the district court is to determine the harm that will be suffered by the plaintiff if no preliminary injunction is entered."  *Id.*  The harm demonstrated by the plaintiff must be "neither remote nor speculative, but actual and imminent."  *Id.*  The district court must then balance this harm against the harm which would be suffered by the defendant if the preliminary injunction is granted.  *Id.*

Once this balancing is completed, the district court can then determine the degree to which

the plaintiff must demonstrate a likelihood of success on the merits. *Id.* The Fourth Circuit has explained this balancing test as follows:

> If, after balancing those two factors (*i.e.* irreparable harm to plaintiff against harm to the defendant), the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.* (internal citations omitted). Thus, the balancing of hardships must be made before reaching the question of likelihood of success on the merits, because "[u]ntil that balance of harm has been made, the district judge cannot know how strong and substantial must be the plaintiff's showing of 'likelihood of success.'" *Id.* at 263-64 (internal citations omitted).

After the district court has balanced the hardships, determined the required showing of likelihood of success on the merits, and analyzed that likelihood, the district court also analyzes the final factor, the public interest. *Id.* at 264. Once this analysis is completed, the district court is in the proper position to make a final determination of whether a preliminary injunction should be entered. *Id.* at 264

### 1. <u>Irreparable Harm to Plaintiff</u>

"Irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). MedServ contends that it will suffer irreparable harm if Rooney is permitted to continue soliciting business from MedServ customers on behalf of his new employer. MedServ points out that it seeks to develop long-term relationships with its clients, hoping to meet their medical equipment servicing and repair needs over many years. As such, MedServ argues that the

loss of a customer with whom an open-ended, continuing relationship has been established constitutes irreparable harm. In addition, MedServ asserts that Rooney, as one its Business Associates, had access to confidential client lists, customer information, and various trade secrets. The potential disclosure of this confidential information, it is argued, warrants the issuance of injunctive relief. In response, Rooney contends that all of the injuries alleged by MedServ can be adequately compensated by money damages. Rooney argues that the damages flowing from the loss of any specific contract are readily calculable and therefore do not constitute irreparable injury.

Although, as a general matter, "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough [for the issuance of injunctive relief]," *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (quoting *Samson v. Murray*, 415 U.S. 61, 90 (1974)), courts have recognized that the loss of customers can constitute irreparable harm. For instance, in *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir. 1985), the Court of Appeals held that "when an account executive breaches his employment contract by soliciting his former employer's customers, a nonsolicitation clause requires immediate application to have any effect." *Id.* at 1054. Because customers cannot be "unsolicited," subsequent monetary relief may be inadequate to return the parties to the status quo; the "speculative" nature of the prevailing party's damages would make it impossible to ascertain "with any accuracy the extent of the loss." *Id.* at 1054-55. Similarly, in *Merrill Lynch v. Stidham*, 658 F.2d 1098 (5th Cir. 1981), the Fifth Circuit Court of Appeals emphasized the uncertainty attendant to the calculation of damages from the loss of future business. "Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. *How such a figure could be*

*arrived at escapes us.*" *Id.* at 1102 (emphasis added).

Here, MedServ and its clients enter into long-term agreements for the servicing, repair, and refurbishment of medical equipment. These are not "one-shot deals"; rather, they have the potential to endure for many years, and, quite possibly, to expand and grow over time. A client who initially relies on MedServ to service a small portion of its medical equipment may, if satisfied with the service it receives, direct larger and larger portions of its business to MedServ. To calculate the value of this lost future income with any certainty is a daunting proposition, if not entirely impossible. Because the monetary damages that would flow from Rooney's breach of the non-compete agreement are speculative and difficult to ascertain, the Court finds that MedServ has established the likelihood of irreparable harm in the absence of injunctive relief. In addition, even if damages to MedServ were readily calculable, there is a serious question as to whether Rooney would be able to satisfy an award of money damages at trial. At the hearing, the Court heard testimony to the effect that MedServ has lost tens of thousands of dollars in revenue as a result of Rooney's solicitation of former clients, and that Rooney, over the past several months, has earned only a fraction of that amount in commissions from his new employer. Despite the general rule that monetary damages alone are not irreparable, "the inability to collect on a damage award can constitute irreparable injury." *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 707 (E.D. Va. 2000); *see also Hughes*, 17 F.3d at 694. Thus, for the reasons stated above, the Court concludes that MedServ has established a likelihood of irreparable injury absent injunctive relief.

**2.     Harm to Defendant**

Rooney posits that he will suffer substantial harm if the Court were to enforce the non-compete agreement. He suggests that he may not be able to find comparable work and that he may,

in fact, be unable to find any work at all, as all of his experience since 1996 has been in the medical services industry. He also states that an injunction will impose significant hardship on his family, as he is the primary income provider for his wife and two children.

MedServ argues that although Rooney may find compliance with the non-compete agreement burdensome, Rooney knowingly and voluntarily acceded to its terms when he signed the agreement in 1998. Enjoining Rooney from violating his contractual commitments would, MedServ contends, constitute little or no harm. In addition, MedServ maintains that the non-compete agreement does not preclude Rooney from earning a living and supporting his family, and that he is not barred from doing so in a related field or through some other form of sales career.

The non-compete agreement, as drafted, provides that Rooney, for one year following his termination, shall not "compete with [MedServ] or solicit any customer of [MedServ]" in any of the geographic areas where MedServ "does business or reasonably expects to do business in the future." (Compl., Ex. A.) Because MedServ is a national corporation, this agreement, with its prohibition of "competition," would preclude Rooney from working in the medical equipment refurbishing industry anywhere in the country. This would indeed impose a significant—and arguably unreasonable—burden on Rooney, who has been employed in this industry for nearly a decade. However, as discussed *infra*, the Court could issue injunctive relief that would protect MedServ's interest in its clients and confidential information without depriving Rooney of the opportunity to earn a living in his chosen field. As such, although Rooney has a non-frivolous argument that agreement imposes a substantial burden upon him, when the likelihood of irreparable harm to MedServ is weighed against the reasonable restriction that the Court could impose on Rooney, the balance of the equities tips in favor of MedServ.

### 3.     **Likelihood of Success on the Merits**

Rooney argues that MedServ will not succeed on the merits because the non-competition agreement is overly broad and unenforceable. He also contends that MedServ materially breached his employment agreement, thereby precluding it from seeking to enforce the restrictive covenant. MedServ maintains that the non-compete agreement is a reasonable protection of its interests and that Rooney's allegations that MedServ breached his employment contract are without merit.

The enforceability of a covenant not to compete depends upon the facts of a given case. *See Millward v. Gerstung Int'l Sports Educ., Inc.*, 302 A.2d 14, 16 (Md. 1973); *Ruhl v. F.A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967). In Maryland, a covenant not to compete will generally be upheld if its duration and geographic area are only so broad as is reasonably necessary to protect the employer's business and if it does not impose undue hardships on the employee or disregard the interests of the public. *Holloway v. Faw, Casson & Co.*, 572 A.2d 510, 515 (Md. 1990).

In the present case, the restrictive covenant would prohibit Rooney, for one year following his termination, from competing with MedServ, from disclosing MedServ's trade secrets, and from soliciting MedServ customers. "Customers" are defined in the agreement as existing customers at the time of termination and those with whom MedServ transacted business in the two preceding years. The agreement has no real geographic limitation, as it would apply wherever MedServ—a company that operates nationwide—presently does business and wherever it "reasonably expects to do business in the future."

Rooney first argues that the agreement is overbroad because it woud restrict him from soliciting not only those clients whom he personally serviced when employed by MedServ, but all

8

clients of his former employer. Rooney notes that Maryland courts have expressed concerns about blanket restrictions on client solicitation and that such prohibitions are generally looked upon with disfavor. *See* Rooney's Mem. in Opp. to Mot. to Extend TRO and Req. for Hr'g on Prelim. Inj. ("Rooney's Opp.") at 8 (citing *Deutsche Post Global Mail, LTD v. Conrad*, 292 F. Supp. 2d 748, 755 (D. Md. 2003); *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 608 (D. Md. 2002)). However, although Maryland courts have indeed "expressed concerns" over broad restrictions on client contact, Maryland courts—and federal courts applying Maryland law—have also consistently upheld non-compete covenants that bar an individual from soliciting any and all clients of his former employer. *See, e.g.*, *Gill v. Computer Equip. Corp.*, 292 A.2d 54, 59 (Md. 1972) (upholding covenant prohibiting the employee, for two years after termination, from working for, or servicing the products of, any manufacturer which had been "represented by" his former employer); *Tuttle v. Riggs-Warfield-Roloson, Inc.*, 246 A.2d 588, 590-91 (Md. 1968) (upholding covenant prohibiting insurance agent's representative, for two years after termination, from "engaging either directly or indirectly in any insurance activities with customers" of its employer employer); *see also Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 639-42 (D. Md. 1998) (upholding restriction on contact with all clients of former employer). In *Fowler v. Printers II, Inc.*, 598 A.2d 794 (Md. App. 1991), the Court of Special Appeals addressed this line of authority and noted that:

> [I]n both *Tuttle* and *Gill*, the Court of Appeals upheld nonsolicitation clauses that prohibited an employee from soliciting not just customers of his former employer, for whom the employee had worked, but rather *all customers of his former employer*. Accordingly, *Tuttle* and *Gill* would appear to dispose of appellants' claims that the covenant here is unreasonably broad because it bars Fowler from soliciting a Printers' customer or account, even though Fowler did not work on that account or for that customer.

*Id.* at 802. Thus, the fact that the covenant at issue in the present case would prohibit Rooney from

9

soliciting all customers of MedServ, and not just those he had personal dealings with, does not render it unenforceable.

Rooney also contends that enforcement of the non-compete agreement is unjustified because he was an independent contractor who developed client relationships without any assistance from MedServ. Therefore, Rooney suggests, it is *he*, not MedServ, who has a protectable interest in those clients. This argument has little merit. MedServ hired Rooney *because* it believed he would be able to cultivate client relationships, and it paid him for doing so. Although he may have relied on his own initiative and resources to cultivate client relationships, the clients he developed were ultimately clients of MedServ, not clients of Rooney, and it is MedServ who has an interest in preserving those relationships.

Rooney also attacks the geographic breadth of the non-compete agreement. Although Rooney's exclusive sales territory was limited to four states, the agreement would preclude him from competing with MedServ anywhere in the country. However, the agreement's apparent nationwide applicability does not make it *per se* unenforceable. In *Intelus*, this Court, interpreting Maryland law, upheld a covenant with no geographical limitation, reasoning that where the plaintiff competes with clients on a global basis, a restriction limited to a particular geographic area would be meaningless. *See Intelus*, 7 F. Supp. 2d 641-42. In *Padco*, the court upheld a restrictive covenant that, despite its lack of geographic limitation, was clearly drafted to limit employment at two directly competing firms. *Padco*, 179 F. Supp. 2d at 607. Thus, the Court disagrees with Rooney's argument that the agreement must be struck down because it lacks a geographic restriction.

In addition, Rooney argues that MedServ is precluded from enforcing the terms of the restrictive covenant by its own unclean hands. Rooney contends that MedServ unilaterally altered

10

the terms of the agreement by decreasing the commissions it paid to its sales associates. Rooney also maintains that despite its promise to him that he would be the only sales associate in the New England, MedServ hired additional sales associates to compete with Rooney in his exclusive territory. MedServ, of course, vigorously contests these allegations. MedServ states that compensation for all sales associates was adjusted several times during the course of Rooney's employment, and that the most recent change, instituted in 2003, was designed to reverse a downward trend in sales associate compensation. MedServ also contends that the sales associates it introduced into Rooney's "exclusive territory" did not directly compete with Rooney, as they focused primarily on medical device component sales, rather than refurbishment, and did not approach the hospitals, surgical centers, or health care providers that Rooney targeted. At the hearing, Rooney did not seriously contest this latter issue, and his arguments with respect to the former—the adjustment of commissions—appeared to be primarily technical, in that he knew, from the very start of his employment, that the Business Associates Agreement did not accurately describe MedServ's commission structure, and only objects to the fact that subsequent changes were not memorialized in writing. The Court believes that by continuing his employment with MedServ, which changed its commissions policy several times during the course of Rooney's tenure there, he essentially acceded to the modifications and waived any claims of breach he may have once had. *See Simko, Inc. v. Graymar Co.*, 464 A.2d 1104, 1109 (Md. App. 1983) (unpaid bonus did not relieve former employee of his obligations under restrictive covenant).

Finally, Rooney contends that the non-compete agreement is overly broad because it prevents him from any kind of "competition" with MedServ, not merely the solicitation of former clients. MedServ counters that a restriction on general competition is reasonable because it prevents Rooney

11

from using the information he acquired as a MedServ employee—such as business plans, marketing and sales strategies, and pricing and service information—to undersell, undercut, or otherwise unfairly appropriate its business. However, at the hearing, the Court heard testimony that at least some of this assertedly privileged pricing information is made available to the public in the form of sales brochures and other marketing materials. In addition, much of the information that MedServ initially provided to Rooney at the start of his employment—such as a spreadsheet containing the names and addresses of hospitals and medical centers in the New England area—is now readily available on the internet, and cannot seriously be characterized as proprietary data. Therefore, the Court does not believe that Rooney's familiarity with MedServ's pricing policies or general operations will, in and of itself, allow him to unfairly compete with his former employer.

This Court has previously noted that "[w]hile the employer is justified in imposing reasonable restrictive covenants to protect its good will, a restraint is not justified if the only harm suffered is increased competition." *Intelus*, 7 F. Supp. 2d at 639. As such, the Court expresses some reservations as to the propriety of MedServ seeking to enforce a covenant that not only prohibits Rooney from exploiting the customer relationships he developed while employed by MedServ, but also prevents him from simply "competing" with his former employer. In *Holloway*, the Maryland Court of Appeals addressed the distinction between these two kinds of restraints:

> There is a line of cases which holds that *restraint is justified* if a part of the compensated services of the former employee consisted in the creation of the good will of the customers and clients which is likely to follow the person of the former employee. And there is another line of cases which holds that *restraint is not justified* if the harm caused by service to another consists merely in the fact that the former employee becomes a more efficient competitor just as the former employer did through having a competent and efficient employee.

*Holloway*, 572 A.2d at 515 (quoting 6A Corbin, Contracts, § 1394). Bearing this distinction in mind, the Court is reluctant to issue injunctive relief that would have the effect of stifling legitimate—rather than unfair—competition. Furthermore, "competition" is nowhere defined in the agreement—thus, the precise nature of the work from which MedServ seeks to exclude Rooney is left unclear. MedServ suggests that its requested relief would leave Rooney free to earn a living "in closely related fields or in other sales careers." Would that include the sale—rather than the servicing and refurbishment—of medical equipment? Rooney states in his affidavit that his new employer, Fibertech, offers products and services that "are far more extensive than the services and products sold by MedServ," including "new and refurbished medical equipment and medical equipment financing for purchases of such equipment." (Rooney Aff. ¶ 15.) Is the financing of medical equipment a practice that is directly competitive with MedServ, or is it a "closely related field"? These issues remain unresolved and illustrate the difficulties inherent in the enforcement of an agreement prohibiting general competition with a former employer. Therefore, the Court concludes that the language in the restrictive covenant stating that Rooney may not "compete with" MedServ is, under the circumstances of the present case, overly broad and unenforceable. As such, the Court will exercise its power to "blue pencil"[1]—i.e., strike—the offending language, while

---

[1] "Blue penciling" is a form of judicial reformation of non-compete agreements. Traditionally, it involves the elimination of words that impose an excessive restraint and, "if the remaining portion of the covenant constitutes a valid contract, enforcing the altered covenant. . . . The practice does not permit the addition or rearrangement of any language to achieve enforceability of the covenant, and the approach is a commonly accepted and utilized technique in Maryland law." *United Rentals, Inc. v. Davison*, 2002 WL 31994250, *4 (Md. Cir. Ct. Jul. 23, 2002) (internal citations omitted). The Maryland Court of Appeals has not definitively ruled on whether the "flexible" approach to blue penciling—under which courts may, in addition to striking offensive language, incorporate additional language or intentions into the covenant—is permitted under Maryland law. *Compare Holloway*, 572 A.2d at 327 (court determined that it would "not reach whether the [flexible approach] applied by the lower courts is part of Maryland law") *with Fowler*, 598 A.2d at 802 (noting that traditional approach "is entirely in accord with

leaving the remainder of the agreement—particularly, the prohibition on client solicitation—intact. *See Fowler*, 598 A.2d at 800.

### 4. Public Interest

As to the final *Blackwelder* factor, the public interest, MedServ argues that there is a strong public interest in giving effect to freely bargained-for, freely executed non-compete agreements. Rooney argues that there is no public in the enforcement of non-compete agreements that are overly broad and unduly burdensome. This Court has previously expressed its view that "the public has an interest in the enforcement of reasonable restrictive covenants" and that "[r]estrictive covenants can play an important role in the growth of a business that depends upon the development of good will through effective customer service." *Intelus*, 7 F. Supp. 2d at 642. Because the covenant here—as modified pursuant to Maryland's well-established "blue pencil rule"—is reasonably calculated to protect MedServ's business and is neither unduly burdensome nor harmful to the public, the final factor weighs in favor of granting the requested injunctive relief.

---

Maryland law"). *See also Conrad*, 292 F. Supp. 2d at 757-58 (concluding that only the traditional approach is valid in Maryland); *Davison,* 2002 WL 31994250, at *5 (same). This debate, however, is largely irrelevant to the instant case, because the non-compete agreement, which states in pertinent part that "[Rooney] shall not, directly or indirectly, compete with [MedServ] or solicit any customer of [MedServ]," remains coherent (and, for reasons stated above, enforceable) when the offending language—"compete with [MedServ] or"—is stricken.

## III.  **CONCLUSION**

For all the aforementioned reasons, MedServ's Motion for Preliminary Injunction shall be GRANTED in part and DENIED in part. The non-compete covenant shall be enforced as written, except for the language banning general "competition" with MedServ, which shall be stricken from the agreement. An Order consistent with this Opinion will follow.


Date: <u>March 21, 2006</u>                                                       /s/
                                                                    Alexander Williams, Jr.
                                                                    United States District Judge